<pre>
 1                    IN THE UNITED STATES DISTRICT COURT

 2                   FOR THE NORTHERN DISTRICT OF TEXAS

 3                            DALLAS DIVISION

 4
    UNITED STATES OF AMERICA,      )        3:18-CR-409-M-1
 5              Government,         )
                                   )
 6                                 )
    VS.                            )        DALLAS, TEXAS
 7                                 )
                                   )
 8  DWAINE CARAWAY,                )
                   Defendant.      )        April 5, 2019
 9

10                  TRANSCRIPT OF SENTENCING HEARING

11             BEFORE THE HONORABLE BARBARA M.G. LYNN

12              UNITED STATES CHIEF DISTRICT JUDGE

13

14  A P P E A R A N C E S:

15

16
    FOR THE GOVERNMENT:         MR. ANDREW O. WIRMANI
17                              UNITED STATES DEPARTMENT OF JUSTICE
                                NORTHERN DISTRICT OF TEXAS
18                              U.S. Courthouse, Third Floor
                                1100 Commerce Street
19                              Dallas, Texas  75242
                                andrew.wirmani@usdoj.gov
20                              (214) 659-8600

21

22

23

24

25
</pre>

1    FOR THE DEFENDANT:            MR. MICHAEL D. PAYMA
                                   Payma Kuhnel & Smith
2                                  1126 N. Zang Boulevard
                                   Dallas, Texas  75203
3                                  michael@pksattorneys.com
                                   (214) 999-0000
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18
     COURT REPORTER:              MR. TODD ANDERSON, RMR, CRR
19                                United States Court Reporter
                                  1100 Commerce St., Rm. 1625
20                                Dallas, Texas  75242
                                  (214) 753-2170
21

22

23        Proceedings reported by mechanical stenography and

24   transcript produced by computer.

25

1          SENTENCING HEARING - APRIL 5, 2019

2                P R O C E E D I N G S

3          THE COURT:  All right.  Be seated, please.

4          (Pause)

5          THE COURT:  Court will proceed to sentencing of

6     Mr. Caraway, Case Number 3:18-409.

7          The Court will note that I have received and have

8     reviewed many letters.  Because of the volume of those I'm not

9     going to read the names of all of the writers into the record,

10    but I read every letter that was sent to me.

11          I was also furnished with a video relating to

12    Mr. Caraway's Legends Tour with a number of students, and I

13    have reviewed that as well.

14          I have -- just so that there's no question about what

15    the Court has in its file, I have the presence report.

16          Have you reviewed that Mr. Caraway?

17          THE DEFENDANT:  Yes, Your Honor.

18          THE COURT:  All right.  I have the addendum to the

19    presence report, the Government's statement of no

20    objections.  The defense has no objections to the presence

21    report as well.

22          I have the Government's motion for a downward

23    departure, which the Court will grant in general, but the

24    specifics of what departure I will grant I will determine; that

25    is, the Court has advice from the Government, but the Court

1  will determine the extent of any departure itself.

2          Is there anything other than Mr. Caraway's sentencing

3  memorandum with the attachments that I should have in addition

4  to what I've listed?

5          MR. PAYMA:  No, Your Honor.

6          THE COURT:  All right.

7          MR. WIRMANI:  Not from the Government, Your Honor.

8          THE COURT:  All right.  Then we will proceed.

9          Counsel, you may call your witnesses.

10         MR. PAYMA:  If I may, Your Honor, I would like to

11 first call Mr. Khalil Coffield, please.  And if you don't mind,

12 he's just going to make a statement.  It's not going to be

13 question and answer.

14         THE COURT:  That's fine.  If everyone who is

15 testifying would please state your full name and spell your

16 first name and your last name.

17         MR. COFFIELD:  Good evening, Judge.  My name is

18 Khalil Coffield, K-H-A-L-I-L.  Last name Coffield,

19 C-O-F-F-I-E-L-D.

20         And good evening, everybody.

21         I am here today because at the age of 12 I met

22 Mr. Caraway at a leadership conference called Tied to

23 Greatness, and it was the first time I learned how to tie a

24 tie.

25         I grew up in a single-parent household where before

1    that my mom was in prison, incarcerated, and my grandmother was

2    raising us at the time.  And so I was nominated to go to a

3    leadership conference out in D.C. by my seventh grade history

4    teacher.  And when I got back, I had a great experience and

5    felt that there were other students who were nominated to go on

6    this trip who didn't get to go.  And luckily I was blessed to

7    be able to meet Mr. Caraway on this day at this event called

8    Tied to Greatness.

9              And he -- he told me that he gave my oldest brother

10   his card.  He looked at me and said, "I gave your brother my

11   card.  I want you to call me.  I want y'all to call me."

12             And so I said, "Well, I want your card, too."

13             And he ended up giving me his card and every other

14   young man there -- there was about 50 young men there who

15   learned how to tie a tie that day.  And he gave every young man

16   up in that building his card.

17             So after that, I gave Mr. Caraway a call.  I called

18   his office.

19             And as the young man who previously was up here, you

20   were talking -- he was talking about how he caught the bus to

21   get around.  I literally -- that's how I grew up.  I grew up

22   catching the bus here in the city of Dallas, and I caught the

23   bus from my apartment down to City Hall literally every day

24   during the summertime to go and intern at Dallas City Hall,

25   working under Mr. Caraway and basically looking at him, looking

1   at all the things that he was doing, you know, as the deputy

2   mayor pro tem at the time was when I was there.  I was there

3   from age 12 up unto age 18 when I went to college.

4          And so I am the first of my family to go to college,

5   and it -- I give a lot of credit to, you know, being around

6   Dallas City Hall with Mr. Caraway, because I never knew what it

7   was like to go to college, and I never knew what it meant to go

8   to college.

9          And I told him -- I was, like, "I don't think I can

10  go to college."  Like, "I don't have anybody in my family

11  that's gone to college before.  I don't know what the

12  experience is going to be like."

13         He looked at me and said, "Boy, you're going to

14  college."

15         And little did I know that I would be able to go to

16  college and not only go to college but first graduate high

17  school and have him guide me along the way with so many

18  inspirational people that have come into my life and go to --

19  not only go to college, the great illustrious Texas Southern

20  University where he happened to graduate from.

21         And that was part of the reason that I went to Texas

22  Southern University, is because I was so influenced by him and

23  the change that he's made in my life, the impact that he's made

24  in my life, and not only the impact that he's made in my life

25  but also being able to witness firsthand the impact that he's

 1   made in other people's lives.

 2           And so one of the things that I have been really

 3   passionate about is helping people, and that's because I have

 4   seen Mr. Caraway do this at first sight.

 5           And I remember one time we -- there was a family that

 6   he had helped out, about 13 kids.  And the young lady, she was

 7   raising these kids with her kids as well, and ended up getting

 8   her a whole brand-new house.  And the house is furnished with

 9   brand-new beds and things for the kids, and also the kids got

10   toys and different things like that.

11           Not only that, he's given out turkeys and things for

12   families in need for Thanksgiving and then Christmas gifts to

13   families in need as well.

14           And as I stated earlier, I come from a family where

15   I'm the first of my family to go to college, and I -- he was

16   there for my high school graduation.  And then also when I

17   graduated college, he was there.

18           And me growing up not having a father, he was my

19   father figure.  He has been the man in my life to tell me

20   what's right and what's wrong.

21           And, I mean, everybody makes mistakes.  I know that

22   he -- he made a mistake, and we all make mistakes.  That's

23   human.  Nobody is in this world perfect.

24           And I -- you know, I have come a long way.  I never

25   thought that I would be working in corporate America.  It's

 1  because me being around Dallas City Hall, seeing all these

 2  professionals, being able to look at somebody and say, "Oh, I

 3  want to be like him when I grow up.  I want to be like this

 4  person when I grow up."  That's what got me to where I am

 5  today.

 6          And Mr. Caraway is a big part of that reason why I am

 7  where I am today, because I'm just a little boy who had a

 8  dream, growing up in the 'hood, and I was able to get out of

 9  that situation, and Mr. Caraway took me under his wing and

10  brought me along the way with him.  Whatever events and things

11  that he was going to, I was right there on his side.

12          And I remember walking around City Hall, Dallas City

13  Hall, with the mayor and city council at times.  And, I mean,

14  they gave me the name "Mini Mayor," because they're, like,

15  "You're going to be the mayor of the city one day."

16          And the impact that he's made on so many people's

17  lives, that's what inspired me to want to be able to be that

18  person, to make a change in the lives of people in general,

19  people who are around me and loving everybody and, you know,

20  just caring for people in general, because that's what he's

21  done for so many people.  So many people look up to him as that

22  person that's, you know, always going to save them or they can

23  go to him if they need anything.

24          And one last thing I would like to share is an

25  inspirational story, an encounter that I had when I came and

1  visited Mr. Caraway one time.

2          There was a gentleman who would come around the house

3  to kind of help the family out with whatever they needed around

4  the house.  This man, I think, was homeless.  And he came

5  around the house one day, and I was over at the house with

6  Mr. Caraway.  And the man, he -- he didn't have any money or

7  anything, but he was asking, "Can I help you guys out with

8  something so that, you know, I can make a little bit of money?"

9          Mr. Caraway ended up, he -- he told me -- he gave me

10  some money.  He said, "Son, I want you to take this man to the

11  store, get him some shirts, get him some deodorant, everything,

12  boxers, whatever it is that he needs."

13          He gave me $100.00, and I took this man to Family

14  Dollar.

15          And he said, "And after you get done doing that, I

16  want you to take him to this hotel and get him a room."

17          And literally I -- that truly, to me, just showed me

18  the kind of character, the type of person that he is, to where

19  he would give his life to help somebody out and make sure that

20  they're good at the end of the day.

21          And that is also in my heart, and I get that same

22  heart from my grandmother, who is here in the audience, to help

23  people and make a difference.  And I feel like he's done that

24  not only in my life but in so many other people's lives.

25          And just to see the smile on that man's face that day

```
 1   and the fact that he was -- Mr. Caraway used his connections,
 2   the person that he knew that owned the hotel, to say, "Hey, I
 3   have this person in need.  Can you help me out?"
 4          And the willingness of people that they are willing
 5   to help him help other people, that truly just shows the impact
 6   that he's made in so many people's lives here in the city of
 7   Dallas as well.
 8          So I thank you guys for hearing my story and letting,
 9   you know, me share my experience with Mr. Caraway with you.
10          THE COURT:  Thank you.
11          MR. COFFIELD:  Thank you.
12          THE COURT:  Will you spell your first name and your
13   last name, please?
14          MR. COFFIELD:  Yes, ma'am.  It's Khalil.  And I'm
15   sorry, I speak a little fast, but it's Khalil, K-H-A-L-I-L.
16   And my last name is Coffield, C-O-F-F-I-E-L-D.
17          And I guess one thing I forgot to mention, now I --
18   after I graduated college, I now live in Austin, Texas, where I
19   work at Oracle.  So I have been there for almost a year now.
20   And as I say, you know, growing up, just a little boy with a
21   dream, I never thought that I would be in a place where I am
22   right now.
23          You know, learning how to tie a tie, I never -- my
24   dad was never around to show me how to tie a tie.
25          THE COURT:  They don't wear ties in Austin.
```

1          MR. COFFIELD:  Well, I mean, I -- I do this thing

2    called Well Dressed Wednesday where every Wednesday I dress up

3    in a suit at work, and I did it also in college.  And so many

4    people, they -- they always ask, "Oh, are you going to a new

5    job interview?  Are you" --

6          And I'm like, "No.  I just -- I just do this.  This

7    is what I want to do."

8          And, I mean, sometimes I feel like people look at you

9    sideways, asking, "Oh, wow.  Well, is this what you're doing?

10   You got a job interview?"

11         But I'm like, "No.  This is who I am.  This is what I

12   want to do."

13         And so, I mean, it's because of this man here that I

14   learned how to tie a tie, but not only that, it's because of

15   him that I am where I am today, and I give him a lot of credit

16   for that.

17         THE COURT:  All right.

18         MR. COFFIELD:  So thank you.

19         THE COURT:  Thank you.

20         Counsel?

21         MR. PAYMA:  Your Honor, I would like to call

22   Ms. Pearl Hicks next to make a statement on behalf of

23   Mr. Caraway.

24         (Pause)

25         THE COURT:  Ms. Hicks, would you like to sit down as

```
 1   opposed to standing up?
 2           MS. HICKS:  I will try to stand.
 3           THE COURT:  Okay.  But if you need to, we'll get a
 4   chair for you.
 5           MS. HICKS:  Thank you very much.
 6           THE COURT:  All right.  Thank you.
 7           MR. PAYMA:  I'm just going to adjust the microphone
 8   for her.
 9           MS. HICKS:  Thank you.
10           THE COURT:  Whenever.
11           MS. HICKS:  My name is Pearl Hicks.  I'm here to
12   represent Mr. Caraway.
13           Mr. Caraway have been everything that this man just
14   said in front of me, but I want to talk on what I know what he
15   did for me.
16           Mr. Caraway worked with my husband before he
17   went -- he wasn't deceased.  He was a promoter, and my husband
18   was an entertainer also and worked for Mr. Johnny Taylor.  They
19   worked side by side.
20           And as long as I known Mr. Caraway, he was always
21   giving, kind, trustworthy, had respect for all the women,
22   always trying to help.  That's all he knew to do, was help,
23   help, help, help.  I'm one of the ones that he helped
24   tremendously.
25           We got in a hole for a minute.  I said I wasn't going
```

1  to say anything, but I have to tell it.  We got in a hole for a

2  minute, and I didn't understand that when they said foreclosure

3  that you didn't have to move just because they said

4  foreclosure.  I got scared, thought we was going to move,

5  because I was only a young girl at that time, which was many

6  years ago.

7        We called Mr. Caraway when my husband was living, and

8  we asked him did he have any money.

9        He said, "No.  What do you need?"

10        We said, "Whatever you have."

11        He came as quickly as he could come.  And when he did

12  come, he walked in the house, he asked us what did we need

13  money for.  We told him.  We said, "Well, whatever you got,

14  we'll take it."

15        He said, "How much do you need?"

16        He put all this money in our hand, which has been

17  over 25 years ago.

18        I'm still in my home 45 years today because of

19  Mr. Caraway.  I would have had to move if it wouldn't have been

20  for Mr. Caraway.

21        All I knew about this man in my life and what I can

22  talk on, he has been trustworthy, a man of his word in

23  everything he did, and he's like a son to me, not just

24  Mr. Caraway.  He's the son that I never had.  I am so proud of

25  him, then and now, and always will be.

```
 1                At age 78 -- I'll be 79 pretty soon -- he's been in
 2     my life for over 30 years, and this is what I have to say about
 3     Mr. Caraway.
 4                THE COURT:  All right.  Thank you.
 5                MS. HICKS:  He's wonderful and trustworthy in my
 6     life.  This is what Mr. Caraway did for me.
 7                I have a place to stay.  And every time it thunder
 8     and lightning and all, I look up and say, "Thank you, Jesus,
 9     and thank you, Mr. Caraway."  And I mean this from the bottom
10     of my heart.
11                I love you, Mr. Caraway, and trust you.
12                And thank you-all for listening to me.  I'm not a
13     speaker.  I had to speak the way I can speak.
14                THE COURT:  You did just fine.
15                MS. HICKS:  And thank you so much for listening to
16     me.
17                THE COURT:  Well, thank you very much.
18                MR. PAYMA:  Your Honor, if I may, I would like to
19     call Reverend Parish next to make a short statement.
20                (Pause)
21                THE COURT:  Mr. Parish -- Reverend Parish, if you can
22     boom your voice from there, you can stay right where you are.
23                REVEREND PARISH:  No, I'll come up here.
24                MR. PAYMA:  Everybody likes a podium, Judge.
25                REVEREND PARISH:  Thank you.  I appreciate the offer,
```

1    the kindness.

2              My name is Donald Parish, D-O-N-A-L-D, P-A-R-I-S-H.

3              I am -- I am Dwaine's pastor.  Excuse me for calling

4    him Dwaine.  Everybody else has called him Mr. Caraway.  But

5    I'm used to calling him Dwaine because we grew up together.

6              Dwaine is a goon man.  He was raised in a good home,

7    and as you have heard the testimonies of these -- those who

8    have already come and spoke about him.

9              I can remember -- it's been about 15 years ago -- we

10   had a motel in our community that was -- had given us a bit of

11   trouble.  People had been killed in this place, prostitution,

12   drugs.  And we were having a very difficult time getting this

13   place closed.

14             And Dwaine came by my office, and he said, "Reverend,

15   is there anything I can do for you?"

16             I said, "Well, Dwaine, we're interested in getting

17   this place closed."

18             And he said, "Let me make a couple of telephone calls

19   and find out what we need to do in order to."

20             And that was the initial start of us getting that

21   place closed down.  That's the kind of person that Dwaine is.

22             The community and his district love him because he's

23   so responsive.

24             Telephone calls.  He always returned telephone calls.

25   And if it was in his power to do something in order to help the

1    situation, he did it.

2          Now, the young man said a minute ago everybody makes

3    mistakes.  And I think Dwaine found himself in a situation --

4    first of all, he was confused about what was going on.  He

5    thought one thing was happening, and it ended up being

6    something else.  But then also he was in a financial bind.  He

7    was helping his mother.  He's her main caregiver.  And that --

8    a lot of expenses come along with that, and he hasn't been too

9    long buried his father.

10          And so I just think that he got caught in a situation

11   that he felt like he could remedy that situation and made a

12   mistake.

13          And he has said to me -- he apologized.  He's

14   apologized to the community.  He came to church, apologized to

15   all our church members.  And that's just the kind of person

16   that Dwaine is.

17          I am here on his behalf, and I would like to ask this

18   Court if you could find it in your heart to show leniency and

19   mercy toward this good man.

20          Thank you.

21          THE COURT:  Thank you, Reverend.

22          (Pause)

23          MR. PAYMA:  Your Honor?  I'm sorry, Your Honor.

24          THE COURT:  Is this new math, Mr. Payma?  New math?

25          MR. PAYMA:  Pardon me?

1          THE COURT:  New math?  I asked you how many witnesses

2   you had --

3          MR. PAYMA:  Yes, Your Honor.

4          THE COURT:  -- and you said three.

5          MR. PAYMA:  Yes, Your Honor.

6          THE COURT:  And Mr. Caraway?

7          MR. PAYMA:  Yes, Your Honor.

8          THE COURT:  Have you got another now?

9          MR. PAYMA:  No, Your Honor.

10          THE COURT:  Okay.

11          MR. PAYMA:  Mr. Caraway.  I'm calling Mr. Caraway for

12   his statement.

13          THE COURT:  Okay.

14          MR. PAYMA:  If I may.  May I?

15          THE COURT:  Yes.

16          (Pause)

17          THE COURT:  Mr. Caraway, you have the right to speak

18   to me on any matter that you wish.

19          THE DEFENDANT:  Thank you.

20          Good afternoon, Your Honor.

21          THE COURT:  Good afternoon.

22          THE DEFENDANT:  Let me -- let me first say I have

23   some notes, but I'd much rather just speak from my heart.  And

24   I may look down --

25          THE COURT:  Sure.

1          THE DEFENDANT:  -- just to stay on point --

2          THE COURT:  All right.

3          THE DEFENDANT:  -- without a lot of rambling.

4          First of all, Your Honor, the last time I was in your

5    court I became a convicted felon.  I took the plea and became a

6    convicted felon.  The time before that I was here testifying on

7    behalf of the City.

8          I stand before you today embarrassed, ashamed.  All

9    the good things that you heard about what I have done in the

10   past and the things that I do from my heart and have done over

11   the years, it's all great, but I made a mistake, and those

12   things are erased, the good things, because now I let the

13   poison come in under the door, and it got into my nose.  And I

14   stand here fully, fully embarrassed.

15         I have humiliated the City of Dallas.  I have

16   humiliated my council colleagues.

17         Ms. Pearl talked about the trust.  Well, the trust is

18   that, but I made an error, and the citizens of the city have

19   the right and they have lost trust in me because of a mistake

20   that I made.  I made the mistake.

21         And I know that the press and everybody, they are

22   here, but they need to hear and everyone -- and, Your Honor, I

23   want you to know that I have -- I haven't been asleep since

24   August, because this has been a fire burning in me because of

25   how embarrassed, humiliated, how wrong it was.

1          I've admitted that I'm wrong.  I have taken full

2    responsibility.  I continue to take full responsibility.

3          When I was talking to Khalil, I tell Khalil even now,

4    tell the truth.

5          My mother taught me one lie leads to another.

6          When the FBI knocked on my door about 6:30 on July

7    the 10th, I invited them right on in.  I didn't think that I

8    needed a lawyer, because the only thing that I needed to do was

9    just tell the truth.

10         And as we sat in my house and I begin to tell the

11   truth, one, I didn't think I really was in trouble, but then

12   once it was explained to me -- because I believe in the system.

13   How can I be an elected official and setting policy, not

14   believing in the system.  And then when the system I mess up,

15   then I try to do something else different.  It's not in me to

16   do that.

17         I want to say about the July the 10th and from that

18   point forward, as a believer in the system, the agents were

19   doing their job, and they were respectful.

20         The U.S. Attorney has done his job, and they were --

21   they've been respectful.

22         Ms. -- Ms. Sarah over here, she's doing her job, and

23   she's pretty tough, but she was respectful.

24         And the IRS agents, they came and they were

25   respectful.

1          And I have the utmost respect for them, but to the

2    citizens of the city -- and I look at all of you -- I apologize

3    to each and every one of you.  I've let a lot of people down.

4    I have let a lot of people down.

5          But I chose, Your Honor, to not drag us through and

6    drag out trials and create "Free Dwaine" and candlelights and

7    all of this stuff, because I accepted the responsibility

8    shamefully.  I messed up.  I messed up, and I take full

9    responsibility.  And I have not slept at all.

10          I may not stand here shedding tears, but I have a

11    burning in my heart and in my soul.  I have embarrassed the

12    City.  I have embarrassed the kids.  I have embarrassed my

13    council members.  I have embarrassed this, your court, because

14    we're here today only because of me.

15          But, you know, I want to just say that I deserve and

16    I respect whatever comes to me from my actions.

17          I talk about crime.  I shut down drug houses.  I shut

18    down motels.  I do everything on behalf of the community, but I

19    let the wrong thing slip under my door, and I do regret it, and

20    it will never happen again.  But not to just say that, I still

21    stand here prepared to take whatever the punishment that I must

22    have to take.

23          Reluctantly, I'll tell you this.  My mother, she's 90

24    years old.  I'm her sole caretaker.  And she told me to tell

25    you something.

1          I said, "Mother, I'm going to be -- I'm going to be

2     missing for a while."  I did tell a little white tale about it.

3     I said I'm going to go take a job, I may have to go take a job

4     somewhere.

5          She said, "Well, I'm going with you."

6          I said, "Mother, you probably can't go with me," but

7     she said, "I'm going over the fence, and I'm going with you."

8          I love my mother.  I love this city.  I love this

9     city.  I worked hard for the city, but I embarrassed the city.

10    I embarrassed the city.  I embarrassed myself.  I embarrassed

11    my family.  I'm ashamed.  I'm remorseful.  I have cried.  I

12    have done it all.

13         And I just want to say those things, because instead

14    of reading stuff that I did write down, I think it's more

15    important for me just to speak from my heart and let my heart

16    tell you that my heart is heavy.

17         These are the darkest days of my life, and I did not

18    plan to go out of politics this way.  But now, even after this

19    is over, I will still be committed to helping and doing the

20    things for other people greater than just doing them for

21    myself.  That's just how I have been in.  I made a mistake, but

22    I can't get, just because I made a mistake, think, okay, it's

23    just okay.  It's not okay.

24         I preach and tell people, even today as I'm going

25    through, as an example, tell the truth.

1          I told the truth.  I'm still telling the truth.  I'm

2     going to continue to tell the truth.  I'm going to continue not

3     in politics but in every way that I possibly can to continue to

4     encourage the youth, to reach up, reach out, because there's

5     something greater in the world out here waiting here for you.

6          I appreciate the fact that you've allowed me to have

7     this moment.  I have my faith in God, and I will not lose

8     faith.  I have respect for this Court.  I have respect for this

9     city.  I have respect for the taxpayers.  I have respect and

10    remorse for the things that I have put them through.

11         I didn't want to have no trial.  I could have had a

12    trial, and it would have cost so much money.  Why have a trial

13    when all you got to do is tell the truth?  And protect the city

14    as best I can, even in the darkest moments of my life.

15         Your Honor, thank you.

16         I have rambled a lot, but --

17         THE COURT:  No, that's fine, Mr. Caraway.

18         THE DEFENDANT:  Thank you.

19         THE COURT:  Thank you.

20         All right.  Mr. Payma?

21         MR. PAYMA:  Finally, Your Honor, I would like to make

22    a closing statement --

23         THE COURT:  Yes.

24         MR. PAYMA:  -- on behalf of Mr. Caraway, if I may,

25    very briefly.

 1            THE COURT:  Mr. Caraway, you come on up with your

 2    lawyer, please.

 3            (Pause)

 4            MR. PAYMA:  I'm one of those guys who refuses to buy

 5    bifocals, so I have to take my glasses off, if I may.

 6            If I may, Your Honor.

 7            Your Honor, these are difficult times for Mr. Caraway

 8    and his family.  He's being sentenced to federal prison today.

 9    It's even more difficult because he knows of the pain he has

10    caused his family, the citizens of Dallas, his former

11    constituents, the people who looked up to him, as well as his

12    former colleagues on the City Council.

13            You heard him apologize to them and ask for

14    forgiveness.  You heard the statements made by those people who

15    appeared here today on Dwaine's behalf.  Those speak for

16    themselves, and I don't think I can add a single word to them.

17            I'm here today speaking for a defendant who has pled

18    guilty to a very serious offense and who is awaiting to receive

19    the sentence this Court will shortly impose upon him.

20            I have known Dwaine Caraway for more than ten years.

21    He is more than a client; he's a friend.  And that's what makes

22    this difficult for me personally.

23            In this great country of ours, we have laws, laws

24    that each and every one of us is expected to adhere to.  And

25    when we violate those laws, we must face consequences.

 1            But more than violating the law, Mr. Caraway stands

 2    before you with his head down, knowing that he has betrayed the

 3    trust of the people who believed in him and looked up to him.

 4            As a public official, he took an oath to uphold the

 5    law and to serve, but he fell short of that promise.

 6            Since July 25th of last year, when Dwaine showed up

 7    at my office unannounced, I have met with him almost every day.

 8    And every day I have seen the pain in his eyes, in his voice,

 9    and his heart, the pain of having betrayed all those -- all

10    those he cares for so dearly, the pain of having brought the

11    shame to the Caraway family name and to his late father's

12    legacy.

13            I thank God that his 90-year-old mother that he

14    mentioned, who suffers from dementia, does not fully understand

15    what's going on here today.  She probably did not understand

16    the reason for such a long embrace this morning when Dwaine

17    went to see her for what may be the last time.

18            I'm sure he wishes he could turn back the clock to

19    that famous day in 2011 when Larry Duncan brought Bob Leonard

20    into his office at City Hall.  And he wishes instead of

21    greeting them with a smile and a handshake that he told them to

22    get out and to never come back.  But we can't turn back time,

23    Your Honor.

24            Mr. Caraway showed weakness when he should have shown

25    strength.  He let temptation overtake his common sense and

1   common decency.

2          Even if Dwaine did not realize the wrongfulness of

3   his actions back in 2011 or even if he justified them to

4   himself somehow back then, he quickly realized the harm he has

5   caused and accepted responsibility, not through words, which is

6   easy to do, but through his actions since last July.

7          There is no way I can minimize his conduct or provide

8   the Court with an excuse.  If someone else can, then they are

9   better lawyers than I am.

10         But what I do know is that on July 10th, when he was

11  confronted at his home by federal agents, this time the real

12  Dwaine that I have known for ten years took over, and he

13  immediately spoke to -- and he immediately agreed to speak to

14  the agents and to tell the truth, as evidenced in the

15  presentencing report that's before you as well as the

16  Government's motion for downward departure.  On July 10th

17  Mr. Caraway made a conscious decision to try to redeem himself

18  in the eyes of God and law.

19         I would like to inform the Court some facts that the

20  Court may not know.

21         For the past ten years or so, Mr. Caraway has had my

22  personal cell phone number in his phone, and it wasn't unusual

23  for him to call me up out of the blue and say, "Hey, I have got

24  a question to ask you," or, "I need your advice on a matter."

25         However, on that day, July 10th, when the agents

1    showed up at his house, Mr. Caraway chose not to call me.  He

2    probably knew what my advice would be just like any advice --

3    any lawyer to his client:  "Don't talk, take the Fifth, wait

4    till I get there."

5          But as he told you already, he did not need a lawyer

6    to tell the truth.  So he sat down and spoke the truth and

7    immediately accepted responsibility for his actions.

8          From July 10th, nine, ten months ago, until just a

9    few days ago, Dwaine has been cooperating with the Government

10   and providing them with any information they've requested and

11   answered all their questions, the extent of which is reflected

12   in the Government's motion, which I'm not going to go into

13   detail.

14         Your Honor, during each of our lives there comes a

15   time that we try to undo or lessen the harm we may have done to

16   others.  Sometimes all it takes is a simple, sincere apology,

17   and sometimes it requires a lot more.

18         Dwaine Caraway has sincerely apologized and has shown

19   remorse for the stain that he has placed on the city he loves,

20   but he also understands that an apology and remorse will not be

21   enough.

22         When on July 27th Dwaine was told of the actual

23   charges that were going to be brought against him and the

24   extent of the possible federal prison he was facing, his first

25   concern was not his future but rather the commitment he had

1   made to 200 underprivileged teenagers whom he had made a

2   commitment to take to Montgomery, Alabama for a college visit.

3   I believe the Court has a copy of the video of that trip.  This

4   was his ninth time he was doing this for these teenagers.

5          He asked if he could fulfill that obligation to those

6   children before appearing -- before appearing before you on

7   August the 2nd or August the 9th and admitting to his guilt and

8   accepting a plea.  That's the Dwaine I know, and that's the

9   Dwaine I hope the Court will see.

10          In our sentencing memorandum I have provided this

11   Court with a number of things that Dwaine has done for our

12   community, and I won't repeat them here again.  I'm sure every

13   reporter sitting behind me in this courtroom can either

14   remember him or they can simply Google Dwaine's name and it

15   will pop up on the screen.

16          Also, the reason for my statement is not to try to

17   minimize Dwaine's action but rather to plead for leniency from

18   the Court.

19          Dwaine knows and accepts the fact that he has done

20   wrong and should pay a price for his actions; however, I

21   believe this case is unique, because no other official has gone

22   to the lengths Dwaine has gone to to attempt to right the

23   wrongs of his actions.  Again, I would point to the

24   Government's motion to support this statement.

25          I sincerely believe that the evidence, the testimony

1    you heard, and the motions filed by -- both by the Government

2    and the presentencing report before you warrants additional

3    departure from the applicable Sentencing Guidelines, and I ask

4    the Court to sentence Mr. Caraway to something below what the

5    guidelines call for.

6              Finally, I would like to add that regardless of the

7    sentence that the Court will impose on Mr. Caraway today,

8    Mr. Caraway will accept and respect the sentence and will leave

9    this courtroom with a promise; that if and when he's a free man

10   again he will continue to serve the citizens of Dallas, not as

11   a public official ever again, but as an ordinary citizen, and

12   he will continue to work with the youth to provide them with

13   the opportunities, like Khalil, to live a better life as he has

14   done in the past.

15             Your Honor, I believe the stories that you heard from

16   the three individuals that spoke on behalf of Mr. Caraway

17   speaks volumes of who Dwaine Caraway is.  I believe -- I think

18   in 25 years of practice it's the first time that I've had a

19   client who immediately accepted the responsibility, did not

20   want a lawyer there, because he knew what he had done was

21   wrong.  He believed he betrayed the city, and he accepted full

22   responsibility for it.

23             He told you he has not slept a good night since July

24   the 10th of last year.  These have been tough times.  And all

25   we can do is ask the Court to consider all these factors, the

1   fact that Mr. Caraway is a 67-year-old man, or he will be 67 in

2   a few days, and consider the factors that -- I'm not going to

3   tell the Court about the factors under the U.S.C.

4          So having said that, we ask the Court for mercy, we

5   ask the Court for leniency, and we ask the Court to sentence

6   Mr. Caraway to below the recommended Sentencing Guidelines.

7          Thank you, Your Honor.  Thank you very much.

8          THE COURT:  All right.  Counsel, I do have one

9   question; and, that is, I sent word to you that this case has

10  been pending for quite some time, and the Court denied several

11  motions for continuance, I thought it was time to get on with

12  it, and that Mr. Caraway needed to be prepared to be taken into

13  custody today.

14         MR. PAYMA:  Yes, Your Honor.

15         THE COURT:  You indicated in your sentencing

16  memorandum that there is a need for 60 to 90 days to probate

17  Mr. Caraway's father's will.

18         I don't understand that.  Mr. Caraway's father passed

19  away several years ago.

20         MR. PAYMA:  Yes, Your Honor.

21         THE COURT:  What is it that is scheduled in the next

22  60 to 90 days?

23         MR. PAYMA:  May I explain, Your Honor?

24         THE COURT:  Yes.

25         MR. PAYMA:  Your Honor, when we were sitting past --

1 | I think -- I want to say it was in January this year, when

2 | Mr. Caraway and I were kind of anticipating what may happen and

3 | trying to figure out, because his biggest concern was his

4 | mother's welfare, that's when he told me that his father had

5 | passed away actually on February 13th four years ago.

6 | And I have a probate attorney in my office who's a

7 | partner of mine, so we asked quickly, and she says you have to

8 | file probate within four years or else you can't.

9 | So we were able to get a copy of the will, which

10 | that's all we had, and we filed it on February 13th, so we

11 | opened up an estate.  Because we only had a copy, the process

12 | is a lot longer, because we have to get people to come and

13 | vouch and testify or certify that this is a true, correct copy.

14 | About a week to ten days ago -- I think around the

15 | time that I filed that motion, we finally found the original

16 | from the previous lawyer.  And we're in the process of getting

17 | that will admitted or probated in the probate court.  I believe

18 | it's Probate Court Number 2 or 3 of Dallas County.

19 | And then it has to -- because it's a new will, it has

20 | to be posted for a certain amount of time for anybody else that

21 | may want to step forward.  So that process takes anywhere from

22 | 30 to 60 days for that to happen.

23 | His mother's conditions are not in a way that I can

24 | just go up and pick her up and drive her to the courthouse,

25 | because I think because of her mental situation, having Dwaine

1   with her would have been a lot easier, because she does have to

2   appear in court and identify herself before the Court.

3            That's the reason we're asking the Court for

4   additional time, so that we can wrap up the probate and put

5   those matters behind us so that his mother will not have to go

6   through any issues with the property that she has, the home

7   that she lives in, because it's still technically in his

8   father's name.  So we have to go and actually be able to

9   transfer all this property into her name so that there will not

10  be a problem, whether it's with taxes or any claims or so

11  forth.

12            So that's why we ask for that.

13            And prior to that, I had asked for a little more time

14  because of the -- some health conditions that I was undergoing.

15  And those were --

16            THE COURT:  I'm not talking about that now.  I'm

17  talking about this issue of the probate.

18            MR. PAYMA:  But that probate is pending.

19            THE COURT:  Is Mr. Dwaine Caraway the named executor

20  in the --

21            MR. PAYMA:  He is the executor.  Yes, Your Honor.

22            THE COURT:  Is he capable of being appointed as the

23  executor as a convicted felon?

24            MR. PAYMA:  Yes, Your Honor, I believe so, because

25  the executor -- he is not the beneficiary of the will.  His

1  mother will be the beneficiary of the will.  So I don't believe

2  that's going to be a problem.

3          My attorney who works on probate matters has informed

4  me that that is not a problem.  But he does need to go and get

5  the matters done, get the proper papers filed with the -- with

6  the Dallas County.

7          THE COURT:  Do you have a hearing scheduled?

8          MR. PAYMA:  We had a hearing scheduled, but because

9  we found the original will, now we have to amend our

10  application and file it with a -- with the actual will, because

11  the process --

12          THE COURT:  If Mr. Caraway were not available to be

13  the executor, what would happen?

14          MR. PAYMA:  I do not know, Judge.  I think it will

15  create a lot of problems, because I don't believe -- I don't

16  believe -- and, again, I'm not the expert in the probate law.

17  I wish I had asked Ms. Smith to come with me today to answer

18  those questions.

19          I believe -- the problem, Judge, is that because of

20  Ms. Caraway's current mental health, she cannot rewrite a new

21  will because mentally -- she's in all likelihood not mentally

22  competent to rewrite a will and assign different beneficiaries.

23          THE COURT:  Well, I used to do estate litigation.  I

24  would say that's 100 percent true, that a person with dementia

25  cannot write a will.

 1            MR. PAYMA:  So that avenue is closed to us.  The only

 2   avenue is to proceed with what we have with an administrator,

 3   and that as soon as we can get the letters and then the orders

 4   from the Court, that estate will be closed.

 5            THE COURT:  Okay.  I just need to understand what

 6   you're saying to me.  Mr. Caraway's mother is the beneficiary?

 7            MR. PAYMA:  Yes, Your Honor.

 8            THE COURT:  Mr. Caraway is the named executor?

 9            MR. PAYMA:  I believe so.  Yes, Your Honor.

10            THE COURT:  And you have in mind that the court,

11   state court, the probate court, Mr. Caraway's conviction, tax

12   issue, all that notwithstanding, that Mr. Caraway would

13   nevertheless be appointed to be the executor of the estate and

14   that his responsibilities in that regard that would require his

15   personal appearance would be done in 60 days?

16            MR. PAYMA:  I believe so, Your Honor.  And that --

17            THE COURT:  All right.  I'm not terribly persuaded by

18   that, so --

19            MR. PAYMA:  Well, if I may just explain, we could

20   have had this done had we had the original will on day one, but

21   we had to file the will with a copy, which it requires, I

22   believe, additional steps to kind of verify that the copy is a

23   true copy of the original.

24            Now, we were able to locate the actual original will,

25   which makes the process easier.  All that the administrator has

 1    to do would be, I guess, to appear, because his mother would be

 2    the beneficiary and entitled to the property and transfer it to

 3    her.  And then she has her own will, which she can -- you know,

 4    which is a different story altogether.

 5              THE COURT:  Well, I'm not going to go down the road

 6    of going too far with opining on probate matters, but generally

 7    speaking, a person with dementia is not likely to be the person

 8    in whose name title to property comes.  Usually there's a

 9    guardianship or a conservatorship.

10              So I don't want to go too far with this --

11              MR. PAYMA:  Yes, Your Honor.

12              THE COURT:  -- but I've got more questions than I had

13    when I first started out with you.

14              MR. PAYMA:  Yes, Your Honor.

15              THE COURT:  So -- all right.  I'm going to leave it

16    at that for a moment.

17              Let me hear from the Government, Mr. Wirmani.

18              You may all step down for a moment.

19              Mr. Wirmani?

20              MR. WIRMANI:  Yes, Your Honor.

21              Your Honor, the Defendant's actions in this case

22    constitute an egregious breach of the public trust.  The amount

23    of money involved, not just with Mr. Caraway but with all of

24    these DCS defendants, is just outrageous.

25              Mr. Caraway is a man -- one of the most powerful

1   politicians in this city.  He's a man that was beloved, trusted

2   by his constituents.  And he has certainly done a lot of good,

3   but at the end of the day he sold out that public trust for his

4   own personal gain, and he did it to the tune of almost

5   $500,000.00.

6           And really the sad thing here is that the taxpayers

7   of this city are going to continue paying for this conduct for

8   years to come.  These defendants will never be able to make

9   restitution that even approaches the losses that the city has

10  suffered.

11          There is another side to this story from the

12  Government's perspective.  Mr. Caraway's -- his decision to

13  take responsibility for his conduct, the swiftness with which

14  he did it, is somewhat remarkable for a sitting politician.

15  And his cooperation since has been exemplary.  We set forth

16  those details in our motion.

17          The only thing I would ask the Court to do is in

18  fashioning a sentence -- the Court has already indicated that

19  it's going to consider the factors and grant the Government's

20  motion.  I would ask the Court not to consider any cooperation

21  going forward, allow the Government to retain that discretion,

22  and file a motion if and when it's appropriate.

23          I would also note that there is interest that has

24  accrued on the tax restitution that needs to be accounted for

25  in the PSR.  And I have those numbers if the Court would like

 1   to hear them.

 2        THE COURT:  Yes, you were to report that to me.  What

 3   are they?

 4        MR. WIRMANI:  The additional restitution is in the

 5   amount of $14,436.21.

 6        And I shared those numbers with Ms. Whitfield and

 7   Mr. Payma this morning.

 8        THE COURT:  Okay.

 9        MR. WIRMANI:  Beyond that, I have nothing further,

10   Your Honor.

11        THE COURT:  All right.  Thank you.

12        All right.  Come on back up, Mr. Caraway.

13        Let me begin, Mr. Caraway, by saying this is a sad

14   day for the city.  These letters that I took several hours to

15   read, they are inspiring pieces of correspondence about a

16   person who was dedicated to his responsibilities as a public

17   servant; who was, what is somewhat unique in public life,

18   responsive to his constituents; who made a difference in his

19   community; who saw a need for youth in his community to get

20   guidance and mentoring.  And Khalil demonstrated that.  And you

21   did all of that.

22        You saw to it that drug houses, seedy hotels, other

23   dangerous areas and conditions in your district were torn down.

24   All of that is good, positive, inspiring leadership.

25        I learned a lot about you from reading these letters,

1    a lot of your friends going back to high school.  You were

2    president of the student body and how you saw your role in the

3    future.  And for most of your life you lived the life you

4    aspired to.

5            And what makes this so particularly sad is that a

6    person who does that, who dedicates his life to public service,

7    who is an exemplar to the youth of our community, comes

8    crashing down to be just bought and paid for like people think

9    most politicians are.

10           And it's not to say that that by any means eradicates

11   the good you did.  It doesn't.  And I shared the view that you

12   expressed and Mr. Wirmani echoed that you did a good thing by

13   recognizing the wrong you had done by not making any pretense

14   about it, acknowledging it immediately, and not putting through

15   the City -- putting the City through a bruising court battle.

16   That's all positive, and you're getting some credit in my mind

17   for all of that.

18           But wouldn't you like your tombstone to read all the

19   good you did without this big asterisk:  "But at the end of the

20   day, he was just another bought and paid for politician"?

21           And that is so sad and such a grave betrayal of all

22   these people and so many more who looked up to you as a man who

23   would not do that, who would not sell out for money.

24           And, you know, the idea that you spent some of these

25   funds on, you know, trips to Las Vegas, flashy clothes, and

1  this kind of stuff, that, you know, is just symptomatic of what

2  people think about politicians and what we all hope politicians

3  aspire to be nothing like.

4          So it's a very sad day for all of us, and I will put

5  myself in that category too, because you were a person who was

6  admired throughout our community, not just your own voters but

7  throughout our community for the good that you did, for the

8  many efforts you made to reach out to other people.

9          I remember that Harlan Crow, I think, was a big

10 funder of your initiative in that Legacy Tour that you took.

11 What a wonderful thing for those kids to be exposed to all that

12 you took them to.  And that's important.

13         But, you know, they look up to you as a person who

14 has the highest ideals, not just one day, not two, not three,

15 but seven days a week, 24 hours a day, 365 a year, and you

16 didn't live up to it.

17         I know what you say, and I'm not holding it against

18 you, when you call this a mistake.  But something that goes on

19 for six years, it's a little hard to call it a mistake, because

20 at a point in time it becomes a habit.  And it didn't -- you

21 just didn't have an epiphany one day that maybe this was the

22 wrong thing.  You weren't -- unless you were expected to do

23 something illegal.  This money wasn't just falling into your

24 hands because they liked you.  They expected something for it.

25 And you let it be known by taking it that you were available to

1    perform.

2         I read what your lawyer argued in the sentencing

3    memorandum, that things didn't really come out differently on

4    these occasions because of it.  I'm not going to get into the

5    weeds on that, but that's not the point.  The point is and the

6    charge is that you were obligated to, as a public servant,

7    perform services honestly for the City.

8         I believe you love the City of Dallas.  I have no

9    question about that.  Your whole life says that.  But you

10   betrayed her in this effort.  She had a right to expect that

11   you would be faithful to the very end.  And I'm very sad for

12   all of us and for you and your family that you didn't live up

13   to the high ideals that you started with and that people

14   expected to find in you.

15        So I have to put all of that together and determine

16   what is the appropriate sentence.

17        I will confess -- I think it was apparent when you

18   appeared before me and entered your plea that I was disgusted

19   by your conduct.  And when I heard that I was agreeing to a

20   plea that capped what I could sentence you to, seven years, I

21   was skeptical, and I made Mr. Wirmani explain why I should

22   accept that plea, because what you did is really bad.  But he

23   convinced me, so I accepted it.  So that means that that's the

24   maximum sentence that I can impose.

25        The sentence that you would be subject to under the

1  Sentencing Guidelines is more than that.

2          You're at offense level 29, criminal history category

3  I.  The guideline sentence for that is 87 to 108 months.

4          So I have already accepted a plea agreement that is

5  below the Sentencing Guidelines.  And without going into any

6  further detail about it, as I have said and as has been alluded

7  to, the Government has filed a motion for me to reduce the

8  sentence further.  And in the public record there is an

9  indication that you are going to cooperate.

10          I understand what Mr. Wirmani has said.  He doesn't

11  want me to take your future cooperation into account so that he

12  can come back and ask me to reduce your sentence in the future

13  because of it, and I will entertain such a motion in the future

14  if one comes to me.

15          So I have to sentence you now based on your whole

16  life as best I can tell it, what's in your heart, what's in

17  your soul, what you did.

18          And I said many times and I will say again today, the

19  tool that I wish I had in my job is a big eraser where I could

20  send somebody back to when they took the wrong road and erase

21  it and put them back down the right road.  I don't have that

22  power.  I have got a lot of awesome powers, but that's not in

23  my toolbox.

24          So I have to look at all that you did, take into

25  account what people have said about you, the good you have done

 1  and the bad you have done, and try to impose a just sentence.

 2          I'm not going to read aloud from all these letters

 3  that I received.  I spent a lot of time on all of them.  But I

 4  want to make mention of two.

 5          Your class of '70 -- I'm class of '70 -- from your

 6  friend Cynthia Nickelberry.  She said, "It is with a heavy

 7  heart that I write this letter for a dear friend and classmate,

 8  Dwaine Richard Caraway.  I am very, very disappointed in him."

 9          She said good things about you, obviously.  The

10  thrust of her letter is positive.  But that's the way I feel

11  about you.  You did so many good things, and that makes me very

12  disappointed in you.

13          I also want to allude to a letter written by your

14  friend Eddie Hill, who has also known you since high school.

15  Mr. Hill said, "Temptation is a true monster.  One can

16  understand the behavior it creates.  I can imagine its grip on

17  the unsuspecting, how its monstrous size and enormity grows

18  larger with each feeding.  I also believe that temptation is a

19  choice and must be managed.  Mr. Caraway fell in the belly of

20  the temptation monster and could not escape."

21          A lot of very thoughtful comments in all these

22  letters.  I point those two out because they emphasize two

23  things that I wanted to say to you:  That I and many others

24  that looked up to you are very disappointed in your conduct.

25  It doesn't erase the good you did, but the fact that you

1    yielded to temptation and kept doing so for a number of years

2    adds to the disappointment.

3          In determining the appropriate sentence, as I said, I

4    am to consider everything before me, and that I will do, to

5    impose a sentence that is sufficient but not greater than

6    necessary to satisfy the purposes of the statute.

7          First, the nature and circumstances of the offense.

8    Very serious.  Didn't pay your taxes, didn't perform on

9    services.  Serious offenses that are inconsistent with your

10   obligations to your community.

11         Your history and characteristics.  But for this

12   conduct, all those are positive.

13         The need for the sentence imposed to reflect the

14   seriousness of the offense, to promote respect for the law, and

15   to justly punish you while deterring others from engaging in

16   similar conduct.  I don't think protection of the public is a

17   factor here that the Court need consider.  You have -- apart

18   from this offense itself, you have not taken any steps that

19   have jeopardized the public, and your absenting yourself from

20   public service I think will further protect the public.

21         Terms of needed educational, vocational, or medical

22   attention.  It is true, Mr. Caraway, that you have a number of

23   serious medical conditions, and the Court notes that those are

24   included here in the presentence report.  And the Bureau of

25   Prisons -- I will recommend that you be incarcerated in the

1   Dallas-Fort Worth area subject to a location that can take care

2   of your particular medical needs.  If that can be done in

3   Dallas-Fort Worth area, that would be my recommendation.

4           I will note that you appeared before me on August the

5   9th to enter your plea and that you have been on pretrial

6   release since then with no problems whatsoever.

7           Considering all of the factors that the Court is

8   obligated to consider, I note that the plea agreement is 84

9   months, but the Court has determined that for the various

10  reasons I have mentioned the Court should further vary or

11  depart, and I will do so to a sentence of 56 months.

12          I will sentence you to 56 months on Count One and 56

13  months on Count Two to run concurrently, for a total sentence

14  of 56 months.

15          As to Count One, pursuant to the Mandatory Victim

16  Restitution Act of 1996, you are ordered to pay restitution in

17  the amount of $482,432.00 to be paid jointly and severally with

18  Robert Carl Leonard and Ricky Dale Sorrells, to be made payable

19  to the United States District Clerk, 1100 Commerce Street,

20  Room 1452, Dallas, Texas 75242.

21          Restitution will be payable immediately with any

22  unpaid balance payable during incarceration for disbursement to

23  the Dissolution Committee for the former Board of Trustees of

24  Dallas County Schools in the amount of $482,432.00, referencing

25  you.

1          As to Count Two, pursuant to 18 United States Code,

2    Section 3663, you are ordered to pay restitution in the amount

3    of $68,906.00, to be made payable to the United States District

4    Clerk, 1100 Commerce Street, Room 1452, Dallas, Texas 75242.

5    Restitution will be payable immediately with any unpaid balance

6    payable during incarceration.

7          Restitution will be disbursed to the Internal Revenue

8    Service in the amount of $68,906.00, referencing you, for tax

9    years 2012, '13, and '14.

10         If upon commencement of your term of supervised

11   release any part of the restitution remains unpaid, you will

12   make payments on the unpaid balance in monthly installments of

13   not less than 10 percent of your gross monthly income or at a

14   rate of at least $100.00 per month, whichever is greater.

15         Now, it doesn't require an advanced degree in math,

16   Mr. Caraway, to know that at $100.00 per month you are not

17   going to be able to pay the amount of money that you owe, which

18   is in excess of $500,000.00.  And there is also $14,436.21.

19         Is that interest on the tax payment?

20         MR. WIRMANI:  That's correct, Your Honor.

21         THE COURT:  All right.  So that additionally is owed.

22   And so the amount is $68,906.00 plus $14,436.21.

23         If you pay that at $100.00 per month, Mr. Caraway,

24   you will not be able to pay that.  You should consider that

25   your sacred obligation to do everything you can to repay that

1  money.

2           Payment will begin while you are in custody, to the

3  extent you can make payments while in custody, and then will

4  continue after you are released from confinement.

5           At least 50 percent of any receipts you receive from

6  gifts, tax return funds, inheritances, bonuses, lawsuit awards,

7  and any other receipt of money will be paid toward the unpaid

8  balance within 15 days of receipt.

9           This payment plan will not affect the ability of the

10  Government to immediately collect payment in full through

11  garnishment, the Treasury Offset Program, the Inmate Financial

12  Responsibility Program, Federal Debt Collections Procedures Act

13  of 1990, or any other means available under federal or state

14  law.

15           Interest on the unpaid balance -- is that interest

16  going to continue to run on the tax payment, Mr. Wirmani?

17           MR. WIRMANI:  It does, Your Honor.

18           THE COURT:  All right.  Interest on the $482,432.00

19  will not run.  The Court will waive that pursuant to 18 United

20  States code, Section 3612(f)(3), but interest will run on the

21  tax debt pursuant to federal statutes.

22           I will not require you to pay a fine, Mr. Caraway, in

23  addition to the restitution because you do not have the

24  financial resources to do so.

25           You are, however, required to pay the mandatory

1   special assessment of $100.00 on each of Counts One and Two,

2   for a total mandatory special assessment of $100.00.

3            When you are released from custody, you will be on

4   supervised release for a term of three years on each of Counts

5   One and Two, to run concurrently with each other.

6            You will comply with the standard conditions

7   contained in the Court's judgment and with the mandatory and

8   special conditions that are set out in a document I'm going to

9   send to you to have you review.  And if you understand and

10  agree to these, you will sign with your counsel.

11           If you have any objections to any of these terms, you

12  will make them, and I will consider them immediately.  If you

13  sign these without raising them, then you will be waiving your

14  right to object to them.

15           (Pause)

16           THE COURT:  Mr. Payma, I'm going to make

17  Mr. Caraway's reporting date May the 5th.

18           I am extremely skeptical about this timetable that

19  you have outlined for me.  I'm going to give you 30 days to get

20  him to do whatever he needs to do in the time he has to do it.

21           MR. PAYMA:  Did you say May 3rd, Your Honor?

22           THE COURT:  May 5th.

23           MR. PAYMA:  May 5th.

24           THE DEFENDANT:  Thank you.

25           MR. PAYMA:  Thank you, Your Honor.

1          THE COURT:  Can you pass that back to me when you're

2     done?

3          MR. PAYMA:  Oh.

4          (Pause)

5          THE COURT:  Mr. Caraway, did you review with your

6     lawyer and sign the document setting out terms of supervised

7     release?

8          THE DEFENDANT:  Yes, Your Honor.

9          THE COURT:  And you understand that you have three

10    years of supervised release and that these terms will apply

11    during the term of supervised release?

12         THE DEFENDANT:  Yes, Your Honor.

13         THE COURT:  And do you agree to them and waive any

14    objections you have to them?

15         THE DEFENDANT:  Yes, Your Honor.

16         THE COURT:  All right.  Then the Court does impose

17    each of the terms of supervised release.

18         Are there any other issues that either the defense or

19    the Government wish the Court to address in the Court's

20    judgment?

21         MR. WIRMANI:  No, Your Honor.

22         MR. PAYMA:  None from defense, Your Honor.

23         THE COURT:  All right.  To the extent that you wish

24    to appeal from any aspect of this case, Mr. Caraway, you have

25    14 days from the date of judgment to do so.

```
 1            If you wish to appeal and you cannot afford counsel

 2    and demonstrate that to the satisfaction of the Court, then the

 3    Court will appoint counsel for you, but you will be obligated

 4    to appeal within 14 days of the date of judgment.

 5            Do you know of any reason why the Court cannot

 6    lawfully impose the sentence as stated?

 7            MR. PAYMA:  No, Your Honor.

 8            THE COURT:  Mr. Wirmani?

 9            MR. WIRMANI:  No, Your Honor.

10            THE COURT:  All right.  Then the Court does impose

11    the sentence as stated.

12            Copies of the presentence report and the addenda will

13    be furnished to the Bureau of Prisons and the Sentencing

14    Commission.

15            Mr. Caraway, I'm giving you until May the 5th to

16    report.  It was my intention to take you into custody today,

17    but in the event that there is something that you need to do in

18    the probate area, you've got 30 days to take care of that or

19    not.  So I will expect you to report on May the 5th.

20            THE DEFENDANT:  Okay.

21            THE COURT:  All right.  Is there anything further?

22            MR. PAYMA:  I'm assuming we will get instructions on

23    the reporting place --

24            THE COURT:  Yes.

25            MR. PAYMA:  -- from Probation.
```

1          THE COURT:  All right.  Thank you.

2          MR. PAYMA:  May we be excused?

3          THE COURT:  Yes, you may.

4          MR. PAYMA:  Thank you.

5          THE DEFENDANT:  Thank you.

6          (Hearing adjourned)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              INDEX

2    Court's ruling.......................................... 43

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      I, TODD ANDERSON, United States Court Reporter for the

2    United States District Court in and for the Northern District

3    of Texas, Dallas Division, hereby certify that the above and

4    foregoing contains a true and correct transcription of the

5    proceedings in the above entitled and numbered cause.

6      WITNESS MY HAND on this 18th day of April, 2019.

7

8

9
                                 /s/Todd Anderson
10                               TODD ANDERSON, RMR, CRR
                                 United States Court Reporter
11                               1100 Commerce St., Rm. 1625
                                 Dallas, Texas  75242
12                               (214) 753-2170

13

14

15

16

17

18

19

20

21

22

23

24

25